# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 22-0273V

SCOTT EGAN,

                Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                Respondent.

Chief Special Master Corcoran

Filed: October 28, 2025

*Laura Levenberg, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Camille Michelle Collett, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On March 10, 2022, Scott Egan filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on September 26, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

The parties were unable to settle the claim, and have now fully briefed entitlement and damages (ECF Nos. 30, 32, 33). For the reasons set forth herein, I find that Petitioner is entitled to compensation, and award damages for actual pain and suffering in the amount of $98,000.00, plus $289.54 for unreimbursed, out-of-pocket medical expenses.

## I.    Factual Evidence

### A.  Medical Records

Petitioner received a flu vaccine in his left deltoid on September 26, 2020. Ex. 1 at 4. Approximately five weeks later (November 2, 2020), he saw orthopedic physician assistant ("PA") Kevin Brown for a two-month history of right knee pain that was interfering with sleep and causing pain with walking and kneeling. Ex. 3 at 96, 98. PA Brown assessed Petitioner with an acute meniscus tear and recommended an MRI. *Id.* at 101-02. Although Petitioner's knee was examined, no general musculoskeletal examination was done, and the record of the visit is silent on shoulder concerns.

Petitioner returned to PA Brown the following week (November 9, 2020) to review the knee MRI, which showed a medial meniscus tear. Ex. 3 at 110. His knee was examined, but the record does not indicate that a general musculoskeletal examination was conducted. *Id.* at 113. Arthroscopic knee surgery was recommended, and Petitioner agreed. *Id.* at 114.

On December 12, 2020, Petitioner was seen in the emergency department ("ED") for chest pain. Ex. 4 at 35. The musculoskeletal review of systems was negative for back pain, and did not address any other musculoskeletal concerns. *Id.* at 36. On musculoskeletal examination, Petitioner was noted to have "[g]ood range of motion in all major joints," with no tenderness to palpation or major deformities noted. *Id.* at 38. He was diagnosed with atypical chest pain and given antacid medication. *Id.* at 42. The record of this visit does not mention left shoulder pain.

The following morning (December 13, 2020), Petitioner was again seen in an ED complaining of anxiety. Ex. 9 at 43. He reported that his wife had surgery for stage III cancer two days prior and was doing well, but he had started breathing hard with his "first panic attack" the day before. *Id.* He had improved while in the ED the day before, but awoke at 3 AM with the same problem. *Id.* He was now having slight paresthesias in his extremities. *Id.* The musculoskeletal examination states only that he did not have edema in his lower extremities. *Id.* at 47. He was given anxiety medication and discharged. *Id.*

Petitioner first sought treatment for shoulder pain in December 2020 – although there is some ambiguity as to the precise date for that treatment event. Ex. 3 at 134-138. Petitioner asserts that he was first seen on December 1st, and *returned* on December 16th, while Respondent asserts that Petitioner was *first* seen on December 16th. On

reviewing the record, I find that it is more likely that Petitioner was first seen on December 16, 2020.[3] *Id.*

At this December 16th visit (now over eleven weeks post-vaccination), Petitioner stated that he had received a flu vaccine in September and "has had pain in shoulder since." Ex. 3 at 138. He explained that "right away after the injection he had pain around the deltoid region that has since persisted." *Id.* The pain was aggravated when he lifted things with his left arm. *Id.* He had not noticed significant loss of motion, although pain was somewhat limiting. *Id.* He had mild weakness and occasional numbness and tingling extending down his arm. *Id.* He had tried over the counter anti-inflammatory and pain medication, as well as hot and cold packs, without relief. *Id.*

On examination, Petitioner' left shoulder was tender to palpation in the subacromial space and deltoid. Ex. 3 at 142. His range of motion ("ROM") was 180 degrees in forward flexion, 170 degrees in abduction, and 80 degrees in external rotation, with positive impingement signs. *Id.* He was assessed with left rotator cuff tendinitis, and given a steroid injection. *Id.* at 142-43. PA Brown noted that this "could be symptoms related to SIRVA," although Petitioner also had pain and weakness consistent with rotator cuff pathology. *Id.* at 143.

On December 29, 2020, Petitioner saw Dr. Kai Huang for a pre-operative examination in preparation for knee surgery. Ex. 2 at 87. He received a tetanus vaccine, although the administration situs was not recorded. *Id.* at 90-91. The record is silent on shoulder concerns. Petitioner's knee surgery was performed on January 22, 2021. Ex. 3 at 174.

---

[3] The records of this provider, TriHealth Orthopedic and Sports Institute, appear to include pages listing a "visit date" even when there does not appear to have been an office visit on that date. Relevant here are seven pages listing a "visit date" of December 1, 2020. Ex. 3 at 130-136. One of these pages lists the reason for visit as "Left Shoulder," noting that Petitioner received a flu shot in September and had pain since then. *Id.* at 136. However, the pages dated December 1st do not include a patient history, review of systems, examination findings, or other indications that Petitioner was seen that day. All of the detailed information about Petitioner's history and examination findings are found in the December 16, 2020 visit record. *Id.* at 138-44. It is not clear what occurred on December 1st, but the evidence does not preponderate in favor of a finding that Petitioner was seen in the office on that date.

This pattern – of TriHealth Orthopedic records including pages for dates on which no office visit appears to have occurred – is repeated several other times. For instance, just before Petitioner first saw PA Brown for knee pain, there are three pages of records listing a visit date of October 28, 2020 (Ex. 3 at 91-93), one of which lists a diagnosis of "[a]cute pain of right knee." *Id.* at 93. However, the record does not otherwise suggest that Petitioner was actually seen on October 28th; there is not a patient history, review of systems, or examination findings for that date.

Therefore, I find that Petitioner's first medical consultation for his left shoulder pain more likely occurred on December 16, 2020.

Petitioner underwent a left shoulder MRI on March 2, 2021. Ex. 4 at 61. The MRI report lists a history of "LEFT SHOULDER PAIN STARTED AFTER FLU VACCINE FALL 2020." *Id*. The MRI showed a small tear near the junction of the supraspinatus and infraspinatus tendons, minimal subacromial bursal fluid, and minimal degenerative changes at the acromioclavicular joint. *Id*.

Petitioner saw Dr. Joseph Thomas, an orthopedist, for a post-operative appointment for his knee on March 8, 2021. Ex. 3 at 184. Petitioner reported that he also "continue[d] to have left shoulder pain where he was previously seen for rotator cuff tendinitis and given an injection." *Id*. On examination, his ROM was "good," but he had positive impingement signs and subacromial pain. *Id*. Dr. Thomas recommended physical therapy ("PT") for his shoulder. *Id*.

Petitioner underwent a PT evaluation of his left shoulder two weeks later, on March 22, 2021. Ex. 3 at 193. He reported left shoulder pain that had been ongoing following his vaccination in the fall. *Id*. He had received a cortisone shot, with minimal benefit, and an MRI showed a rotator cuff tear. *Id*. His pain was constant and localized, ranging from three to seven out of ten. *Id*. at 194. On examination, his left shoulder active ROM was 156 degrees in flexion (compared to 160 degrees on the right), 55 degrees in extension (versus 80 on the right), 145 degrees in abduction (versus 170 on the right), and 85 degrees in external rotation (versus 90 on the right). *Id*. at 196. He reported restrictions in driving, fitness, leisure activities, housework, cooking, and yard work. *Id*. at 198. Petitioner attended three more PT sessions, on March 24, April 1, and April 7, 2021. *Id*. at 203, 213, 220.

Petitioner followed up with Dr. Thomas for left shoulder pain on April 12, 2021. Ex. 5 at 21. He continued to experience pain and limited ROM, and had not seen improvement with a cortisone injection or PT. *Id*. After discussing treatment options, Dr. Thomas recommended surgery, and Petitioner agreed. *Id*.

Four months later (August 20, 2021), Petitioner underwent left shoulder arthroscopy with rotator cuff repair and subacromial decompression. Ex. 5 at 203. He saw PA Brown for a post-operative visit on August 26, 2021. *Id*. at 318. Petitioner was doing well, with the expected level of postoperative pain. *Id*. He was wearing a sling, and had some difficulty sleeping. *Id*. PT was recommended. *Id*.

Petitioner underwent a PT evaluation of his left shoulder on August 30, 2021. Ex. 10 at 4. His pain ranged between four and eight out of ten. *Id*. He reported limitations in reaching, carrying, pushing/pulling, lifting, sleeping, household chores, driving, and activities of daily living. *Id*. On examination, his left shoulder passive ROM was 110 degrees in flexion (compared to 171 on the right), 0 degrees in extension (versus 60 on the right), 55 degrees in abduction (versus 180 on the right), and 21 degrees in external rotation (versus 90 on the right).

Petitioner followed up with PA Brown on September 23, 2021. Ex. 6 at 25. His pain and ROM were improving with PT. *Id*. On examination, his left shoulder ROM was 140 degrees in forward elevation, 120 degrees in abduction, and 65 degrees in external rotation. *Id*. at 29. PA Brown recommended that he transition out of the sling and continue PT. *Id*. Petitioner saw Dr. Thomas on November 1, 2021. *Id*. at 33. He was doing well, and no longer taking pain medications. *Id*. The following month (December 2, 2021), Petitioner saw PA Kaycie Klausing for a follow up visit. *Id*. at 42. He estimated that he was "about 90% improved" and "very happy with his range of motion." *Id*. He continued to experience weakness, as expected. *Id*. He was sleeping well. *Id*.

Petitioner was discharged from PT after 15 post-operative visits on December 13, 2021. Ex. 10 at 81. He was pain-free, and his passive ROM was 165 degrees in flexion, 178 degrees in abduction, 88 degrees in external rotation, and 86 degrees in internal rotation. *Id*. at 81-82. He was noted to have "excellent ROM and good to excellent strength." *Id*. Petitioner had either met, or had a home exercise plan to meet, all goals. *Id*.

### B. Declaration

Petitioner submitted a declaration in support of his claim. Ex. 7. He states that when he received the at-issue vaccine, he "knew immediately that it felt 'different' as the pain was instant and severe compared to all other vaccines" he had received. *Id*. at ¶ 4. He was not aware that a vaccine injection could cause severe damage, and thought the pain would go away. *Id*. at ¶¶ 4-5. Additionally, he was focusing on other health problems: his wife's Stage 3 cancer, which she was treating with surgery, chemo, and radiation, and his own knee problem that resulted in surgery. *Id*. at ¶¶ 5, 9.

Petitioner also remembered his doctor's office telling him that new issues required a "new problem" appointment, rather than being addressed during a follow up appointment for another issue. Ex. 7 at ¶ 6. Therefore, he followed this process, and kept the focus of his November 2020 appointments to his knee, and scheduled a "new issue" appointment for December 2020 for his shoulder pain. *Id*. at ¶ 7.

## II.    Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical

opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A

---

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C. F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

## B. Parties' Arguments on Entitlement

Petitioner asserts that he continuously and consistently related the onset of his shoulder pain to vaccination. Petitioner's Motion for Ruling on the Record, filed June 10, 2024, at *7 (ECF No. 30) ("Mot."). He relies on records starting in December 2020, as well as his March 2, 2021 MRI and declaration testimony. *Id.* Petitioner emphasizes that he reported pain "since" vaccination. *Id.* (citing Ex. 3 at 136).

Respondent argues that Petitioner cannot prevail on a Table SIRVA claim because the medical records do not establish that Petitioner suffered the first symptoms or manifestation of onset of a shoulder injury within 48 hours of vaccination. Respondent's Rule 4(c) Report and Response, filed Aug. 26, 2024, at *7 (ECF No. 32) ("Resp."). Petitioner's first post-vaccination complaint of shoulder pain occurred 81 days after vaccination, when he reported pain "after" vaccination. *Id.* In the interim, Petitioner saw his orthopedist – an appropriate specialist to treat such an injury – twice, but without mentioning shoulder pain. *Id.* at *7-8. Although Petitioner asserts that he was required to make a "new problem" appointment, he later sought care for his shoulder during a follow up appointment for his knee, on March 8, 2021 (Ex. 3 at 184). *Id.* at *8. Petitioner also went to the ED twice, without mentioning shoulder pain, during the time between vaccination and his first report of shoulder pain. *Id.* Respondent finds "curious" Petitioner's lengthy delay in seeking care, and failure to mention his shoulder pain at these intervening medical encounters, in light of his claim that he "knew immediately" that this vaccination felt different. *Id.*

Petitioner objects to Respondent's suggestion that Petitioner's testimony about his understanding that he needed a "new problem" appointment is disingenuous. Petitioner's Reply, filed Sept. 9, 2024, at *2 (ECF No. 33) ("Reply"). Petitioner asserts that, at the time of the March 2021 appointment Respondent cites, neither his knee nor his shoulder pain was a "new problem." *Id.* And Petitioner points out that no medical records suggest that his shoulder pain resulted from anything other than vaccination. *Id.* at *3.

### C. Factual Findings on Onset

I find that the record supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination. Petitioner first sought care for his shoulder pain less than three months after vaccination, and thereafter he consistently related his pain to vaccination.

A treatment delay of this length does not, by itself, raise serious concerns about onset. *Tully v. Sec'y of Health & Human Servs.*, No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024) (finding onset occurred within 48 hours although claimant did not seek care for two and a half months); *Diaz v. Sec'y of Health & Human Servs.*, 20-1003V, 2023 WL 8440873, at *6 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset was within 48 hours where the petitioner delayed seeking care for over three months after vaccination); *Buck v. Sec'y of Health & Human Servs.*, No. 19-1301V, 2023 WL 6213423, at *7 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (finding onset of pain occurred within 48 hours where the petitioner did not seek care for over three months and noting that a delay in seeking care is relevant to onset, but not dispositive). However, a delay in seeking care *coupled with* evidence that the claimant attended medical appointments for other problems raises additional concern. This is particularly so if those intervening appointments are with providers to whom it would be appropriate to report shoulder pain, such as a primary care provider or orthopedist – as occurred here.

But the fact that Petitioner saw his orthopedist twice between vaccination and his first visit for shoulder pain does not automatically mean he cannot prevail. Rather, it merits a closer look at the facts and circumstances of the appointments, the reasons for both the treatment delay and for not reporting shoulder pain at the intervening appointments, and, importantly, what the medical records (from when Petitioner ultimately did seek treatment) say about when his pain began.

In this case, Petitioner saw his orthopedist twice and visited the ED twice in the time between vaccination and his first treatment for shoulder pain. The ED visits in December 2020 do not raise serious concerns about onset. These visits occurred just a few days before his first shoulder treatment. And he sought treatment for chest pain and panic attacks. It is understandable that a person seeking emergency care for these problems may not mention shoulder pain that had been present for over two months.

The two orthopedic visits are more concerning. These appointments occurred just over a month after vaccination, and the records are silent on Petitioner's shoulder – and he concedes that he did not discuss his shoulder pain at them. These concerns are heightened by the fact that the appointments were with an orthopedic provider – an appropriate specialist to treat a shoulder problem, and in fact the provider that he ultimately went to for care.

9

When Petitioner did seek care for shoulder pain, however, he consistently related his pain to vaccination, even if he used vague terminology. Ex. 3 at 138; Ex. 4 at 61; Ex. 3 at 193. And he has provided testimonial evidence that, during the time between vaccination and his first treatment, he was having knee pain and his wife was undergoing treatment for Stage 3 cancer. Ex. 7 at ¶¶ 5, 9.

Taken as a whole, the record supports a finding that, more likely than not, Petitioner's shoulder pain began within 48 hours of vaccination. *See G.C. v. Sec'y of Health & Human Servs.*, No. 19-296V, 2022 WL 21817453 (Fed. Cl. Spec. Mstr. Aug. 9, 2022) (finding onset of shoulder pain within 48 hours despite four-month delay in seeking care with two intervening primary care encounters, where the petitioner consistently reported that his shoulder pain began after vaccination); *Dempsey v. Sec'y of Health & Human Servs.*, No. 18-0970V, 2021 WL 1080563 (Fed. Cl. Spec. Mstr. Feb. 17, 2021) (finding that onset occurred within 48 hours despite four-month delay in seeking care, with two intervening medical appointments, one with the claimant's primary care provider; stating that thereafter, the claimant consistently related onset to vaccination, and adding that the same outcome may not follow if the treatment delay was longer).

However, this record clearly establishes ample opportunity to seek treatment despite Petitioner's understandable reasons for delay – and therefore I cannot find this SIRVA to have the level of pain severity that would be true for cases where a claimant more readily, and consistently, sought treatment. This will be taken into account in my damages determination, as noted below.

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain his post-vaccination symptoms. Ex. 2. He exhibited reduced ROM, and his pain and ROM limitations were limited to the vaccinated shoulder. Ex. 3 at 196. He received a covered vaccine in the United States. Ex. 1 at 4. He experienced residual effects of his injury for more than six months. Ex. 5 at 203; Ex. 10 at 4. And he states that he never received an award or settlement for his vaccine-related injury, nor has he filed a civil action. Ex. 1 at ¶ 14.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, he has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

### III.    Damages

#### A.  Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[5]

#### B.  Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $135,000.00, relying on *Wilson* and *Rafferty*, which involved awards of $130.000.00 and $127,500.00, respectively.[6] Mot. at *10-13. Petitioner emphasizes that he sought treatment "approximately 2 months after his vaccination," and underwent an MRI, a cortisone injection, two rounds of PT, and arthroscopic surgery. *Id.* at *11. He views his treatment as similar to *Wilson* and *Rafferty* except that he asserts that those petitioners did not undergo a cortisone injection and had a shorter overall treatment course. *Id.*

Respondent argues that an award of $70,000.00 for pain and suffering is appropriate, although he does not cite any decisions in support of his proposed award. Resp. at *10. Respondent asserts that Petitioner experienced approximately 15 months of mild shoulder discomfort after vaccination. *Id.* at *12. Petitioner reported pain levels

---

[5] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[6] *Wilson v. Sec'y of Health & Human Servs.*, No. 19-0035V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. March 18, 2021); and *Rafferty v. Sec'y of Health & Human Servs.*, No. 17-1906V, 2020 WL 3495956, (Fed. Cl. Spec. Mstr. May 21, 2020).

ranging from three to seven out of ten before surgery. *Id.* At his final post-operative follow up, he reported that his shoulder pain was 90% improved. *Id.* at *13.

Respondent asserts that the *Wilson* petitioner experienced a more severe SIRVA, although he acknowledges that Mr. Egan's treatment was similar to that in *Wilson*. Resp. at *13. And he argues that the *Rafferty* petitioner underwent more treatment and reported higher pain levels than Mr. Egan. *Id.*

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

Petitioner suffered a mild to moderate SIRVA that required surgery. By 15 months after the onset of his injury, he was 90% better, with "excellent ROM and good to excellent strength." Ex. 6 at 42; Ex. 10 at 82. He underwent a cortisone injection, arthroscopic surgery, two rounds of PT totaling 19 sessions, and an MRI. However, his delay in seeking care – particularly his failure to seek care when he saw an orthopedist for another injury – bears heavily on damages. While I understand that requiring a separate appointment for new issues is not uncommon, in this case Petitioner was not seen for that separate appointment until more than two months post-vaccination.

Although Petitioner's injury has many similarities to *Wilson* and *Rafferty*, there are also important differences. Most significantly, those claimants initially sought care at one month (*Wilson*) and six weeks (*Rafferty*) – suggesting a more severe injury. Petitioner's delay in seeking care – particularly his failure to seek care when he saw an orthopedist *twice* for another injury – is compelling evidence suggesting a milder injury.

While the *Wilson* petitioner's initial treatment period was shorter than Petitioner's, that claimant later returned to treatment. And the *Rafferty* petitioner had more severe ROM deficits than Mr. Egan. However, I acknowledge that Mr. Egan treated for longer than the *Rafferty* petitioner, and underwent a cortisone injection, which neither the *Wilson* nor *Rafferty* claimant did.

In light of the record evidence, I find that an award of **$98,000.00** for pain and suffering is appropriate. Surgery SIRVA cases do typically result in six-figure awards of pain and suffering – but the delays in treatment and gaps and other circumstances herein do not justify such an award.

### D. Unreimbursable Expenses

Petitioner requests $289.54 in out-of-pocket medical expenses, and Respondent does not dispute these expenses. Mot. at *11; Resp. at *14. Petitioner also requests $6,065.00 in expenses for lawn care. Mot. at *12. He argues that he usually tends his

own lawn, but had to pay a landscaper for these services while he was recovering from surgery. *Id.* The only evidentiary support cited or provided for these expenses is cancelled checks. Ex. 12. The checks are made payable to two different individuals. *Id.* One of the checks states it is for "Final Cut" (*id.* at 20); the remainder provide no indication of the reason for the payments.

Respondent objects to reimbursement of these costs as "inconsistent with the statute." Resp. at *14 (citing *Curri v. Sec'y of Health & Human Servs.*, No. 17-432V, 2018 WL 6273562, at *3 (Fed. Cl. Spec. Mstr. Oct. 31, 2018).

Petitioner has not submitted medical record or testimonial evidence that would support his assertion that these expenses relate to his SIRVA; the only link to his SIRVA is attorney argument. Moreover, lawn care expenses are generally not reimbursable expenses, except in rare circumstances not present here, such as a *significantly* more severe injury, and/or proof that the claimant was unable to perform these tasks and had no other means of assistance. *Curri*, 2018 WL 6273562, at *3-4. Petitioner has not demonstrated entitlement to reimbursement of lawn care expenses.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $98,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[7] Additionally, I find that Petitioner is entitled to **$289.54 in out-of-pocket expenses**.

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $98,289.54, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[8]

---

[7] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master